All right, the next case on the calendar is Reagan v. Riverbay Corporation. Okay, whenever you're ready, Mr. Sussman. Thank you very much, Your Honor. I'm going to point to all of you. I'm Michael Sussman, I represent the elements of that very case. This is a challenge to grant some assessment in the gender disability claim, where the district court agrees the time of creation of the case has been made out by the appellant plaintiff, but found that pretext analysis did not go in her favor, and that is under judgement. Our appeal focuses on the error that we believe is manifest with regard to that conclusion. The determination here to terminate Mr. Reagan was made by a gentleman named Ellison. The plaintiff's deposition was to rely on his conversation with two individuals, one a corporate lawyer and the other the chief of finance. Those two individuals indicated they made no such recommendation to him, and fact that there are now those attending, that in advance of the meeting in late August, Mr. Reagan was going to be terminated. In addition, Mr. Ellison indicated that the primary reason for the termination related to a co-religious comment she and Ms. Reagan had made in a prayer session with an assistant of his, a reason not provided by the defendant, Ellie, for the termination. And of course, my client and I don't think they could ever have heard. Now, with regard to... Even if that were the reason, that's not... Sorry. Even if that were the reason, that would not be a termination based on a protected characteristic, right? Assuming that there was a fact-finding and a jury believed that prayer session happened, that Mr. Ellison believed that was a sufficient reason to terminate, that has nothing to do with the summary judgment motion, because my client denied that matter ever happened. She denied there was ever an incident. She denied it was ever discussed. Yeah, but I understand. But, like, litigating over whether that happened wouldn't establish that she was terminated on the basis of sex or disability. In other words, if that was... So I guess my question is, what's the relevance of this prayer session argument? As Chamber established many years ago in the circuit, Your Honor, shifting explanations for an adverse action are a co-fail sign of discrimination. Okay. Here, it's impossible to argue, in my view, as they do in their termination letter, that the issue related to a claimed failure by my client to follow the direction from the semora, which I'll speak about in a moment, and the decision-making says the real reason is that. The real reason is because I wasn't facing her because it was this prayer session. The prayer session never happened. The jury process never happened. That's certainly relevant to pretext. So it is important to understand that shifting explanations and concocted explanations are essential in idle civil litigation. Who's at it? Through the pretext analysis. Now, the Harvard case relates, however, I believe, in this court decision to the morrow-raging interaction in early June of 2015. Context matters. Ms. Reagan was an individual, director of human resources, but she did not have responsibility for Mr. Dushnowsky, and Mr. Dushnowsky was in charge of payroll. There had been a long process at the company, led by Mr. Morrow a number of months, to review classifications of exempt and non-exempt persons. Did that derive from a $6.2 million settlement, which the company entered into in early 2015, of a wage claim based upon exempt and non-exempt employees being misclassified? Isn't it uncontroverted? I don't think there's any dispute that she was involved in some of those interviews, that she worked with Mr. Morrow, there were spreadsheets. So she was involved in this project. Correct me if I'm wrong. True or untrue? She was involved in these sentiments. All right. And it's also true that the key email, the only people on the email for Mr. Morrow, were her and her assistant. True or untrue? True. And it's also true that she then sent out the direction that these who were designated as exempt in the email, she was the one who then allowed them to be mistakenly paid. True or untrue? Untrue, or mistakenly. And let me explain why. All that is true up to that point. What isn't mistakenly is the wrong word. It means it doesn't understand the process which actually had been going on in the company, which was Mr. Morrow made recommendations to a group of individuals which in fact had not included my client, included Mr. Morrow, Mr. Bonds, and Mr. Ellis. And previously, it's equally uncontroverted that they had disagreed the recommendations that he made. Why wouldn't she have been culpable, at least to the extent that she didn't check? To the extent that she believed, as you argue in your brief, like that this wasn't a final decision, she wasn't the one responsible for this. She's the one sending out the checks. So why wouldn't she try to resolve whether that email is in fact going to be the position of the company or not? Isn't that a problem? She understood the process, and I understand the question. She understood the process as being that the gentleman, as Mr. Morrow, was in touch as well with other individuals entirely independent of her, and that they had to give a direction to his recommendations. His recommendations were essentially advisory at that point. They were not to be included. But she didn't check. The whole point is she didn't check. She didn't verify what the result was going to be of any disagreement about his recommendations. And when Mr. Morrow received her late June memorandum, which was contrary to his full findings, Mr. Morrow never even said, wait a minute, what are you doing? Because Mr. Morrow understood that his advice to Hart was not going to be upon her. That's why he did not have a mandate. In fact, these six individuals were the subject of part of that back-and-forth you're describing. The six individuals were part of the back-and-forth you're describing, right? The company asked Morrow to reconsider his recommendations with respect to these six, and then he came back with a recommendation that says, okay, I've looked at it more closely, and I've decided that they're not exact, right? So not excluding them from the determination denies the company the benefit of the process you're talking about. It wasn't part of that process. The company's process, which she understood to be the process, was not that she would receive from Mr. Morrow any, quote, final decision whatsoever. That is not the process. So why is Mr. Morrow sending this e-mail specifically to her? When asked about that, it's unclear. Mr. Morrow, he did give a deposition, and he was asked with regard to that. The understanding that he had was that he was making recommendations, Ellison, Parola, and Luntz. That's what he testified to in his deposition. It's not clear why he sends that to her as, quote, findings.  But even if it were true that the lawyer is sending the e-mail to the wrong person, wouldn't somebody who, an official at the company who receives that e-mail, be obliged to send it to the appropriate person? Absolutely not. She understood that he, Morrow, had independent relationships with the other individuals, including the Schnauzer, who's not under our control, who's the person in charge of payroll. I have a question which maybe is reflected in the record, but I don't think I found it. So the e-mail that Morrow sends to her talks about the findings of the six people, but also says we need to discuss Pierre Hamilton. So it's actually asking her for a discussion. Did they ever discuss Pierre Hamilton? I can't answer on the record. This is no record testimony with regard to him. Okay. Well, then, apart from whether it happened, doesn't it suggest that Morrow is suggesting that Ms. Reagan has to do something in response to the e-mail, because he's saying we should have a discussion? Well, the record to the extent I can speak to it is that no one, Morrow, Reagan, or Craig Thomas, raised any issues with regard to the seventh person. There are discussions later— No, no, but I'm not talking about what happened. I'm not saying that what happened with Pierre Hamilton necessarily affects the outcome. I'm saying the e-mail is not just an FYI. The e-mail, in addition to listing the six people, says we need to have a discussion about something, right? I understand your point, but what I'm saying is that the record, taken most favorably as the movement is, that the movement did not have the kind of role that any of you referred to, the district court attributes to Ms. Reagan with regard to either a determination or implementation of a determination with regard to exempt, non-exempt. That was between Mr. Morrow, Mr. Barola, Mr. Ellison, who had, as the briefs point out, rejected a number of Mr. Morrow's comments in the past, his findings in the past, and they were not implemented. So Ms. Reagan was put in a position where she got this FYI. She believed other people, as in the past, were the implementers of all of this. Okay, so can I ask you, even if we thought that maybe they didn't have to fire her because of this particular e-mail, because maybe her interpretation was reasonable, why is the plausible inference that she was fired on the basis of a protected status? Because Mr. Ellison had, and this is pretty much not controverted in the record, repeatedly refused to honor her disability. There were important executive council meetings in which she was part of. I thought she got two reasonable accommodations, and the year before this happened, they increased her salary by $31,000. Am I correct or incorrect? That was not done by Mr. Ellison. It was done by others. Mr. Ellison, he was focused on the decision-makers. Ellison was the decision-maker. The board at Co-op Village, in response to her equity issues, did increase her salary. That's a fact. But it's equally true that Mr. Ellison was not part of those decisions. So focusing on the decision-maker, Mr. Ellison, concocted a reason as deposition for termination regarding the prayer group. He did not adopt the reason that should be given. Mr. Ellison was surprised with male employees who engaged directors, not simply employees. In very serious transgressions of rules, there was no sanction in regard to that. Those were male employees. The district court said— But none of those incidents cost the company $100,000. Well, somebody cost the company $6.2 million, and nobody even brought it up. But that's a separate issue. Well, it's not a separate issue. It's an important issue. Because if you take as non-factual their argument that the cause of the company of $90,000 and blaming that on a car is so significant in termination, you have to ask yourself, and a jury would certainly ask themselves the question, as to if you just pay $6.2 million in a very simple matter, they didn't even investigate so much as who caused the problem. They didn't do anything to anyone. Wasn't Ellison the one who was responsible for her— I'm sorry. I don't know. I'm sorry. I don't know. Wasn't Ellison the one who brought her back as director of human resources after that position had been merged with another one and then she was restored to that position? The board brought her back on the record, not Ellison. The board intervened and indicated that the salary being paid to her was inappropriate and needed to be increased upon her complaint. The point I'm making is that Mr. Ellison, with regard to Mr. Ellison, you read his deposition closely. Mr. Ellison was not aware—since he was not even aware of the June 9th number, as you remember, and he said most of the charges I'm speaking about, he was not aware of that as an issue. There were meetings in early August in which my client was brought in by Mr. Merola and Mr. Lunds to meet individuals who were affected. No one blamed Clark for the matter. No one said to me, was your mistake that this happened? Mr. Merola is accused by Mr. Ellison of being complicit with him in the decision. He says he never made a recommendation. Mr. Lunds is aggrieved. He's the lawyer. He's supposed to be complicit. He never was involved. These are the exact kinds of factors that lead it forth to say that it's pretext and that a reasonable jury could determine that the reason it did this was not the reason. All right. Thank you, Mr. Sussman. Mr. Saccomano, Jr. Go ahead. Joseph Anthony Saccomano, Jr. Jackson Lunds for the Lund-Lake Court. Pleased to meet you. Pleased to report. The district court appropriately granted the defendant's motion for summary judgment in this case under two claims. First, the claim of sex discrimination, and second, the claim of disability discrimination. I would like to – we go through this in our brief, but I would like to focus the court's attention on the fact that Mr. Ellison, before he was elevated to the position of interim general manager, was also a department head of the Cooperative Services Department. It was in that role that he was interviewed by Mr. Merola and Ms. Raker, and they interviewed him regarding the exemption status of his employees. We quote the testimony in our brief. So the fact of the matter is his rationale, his thinking as to why he thought she was an integral part of this assessment that was going on is because she interviewed him. There was no doubt in his mind that she was involved in this assessment that was being done by outside counsel. Now, with regard to outside counsel, I'd like to differ with counsel. The fact is Mr. Merola testified that he considered Ms. Raker to be his point of contact, his conduit. That's why the e-mails went to her. Ms. Raker doesn't deny getting the e-mail. She said in her deposition when I asked her, she probably clicked on it and closed it. I get a lot of e-mails. So she doesn't dispute she got the e-mail. The text of the e-mail is not in dispute, and what it notifies her as the director of human resources. It's not in dispute that she doesn't pass that information on to anybody else in the management team. It's not in dispute that Merola will go out later on with her name on it. Do you want to address the issue with your opposing counsel called shifting explanations, the prayer service? Do you want to address that? Yes. First of all, the issue of the prayer was not offered by Mr. Ellison as a shifting explanation as to why he terminated her. When you look at his deposition testimony, he said that he terminated her because of this issue of the failure to follow through on the e-mail. He referenced that issue as to when she entered a room and engaged in a prayer and wished ill on the children of her enemies as the reason why he lost confidence in her or in her judgment. But it's not a shifting explanation. It's not a defendant. Neither Mr. Ellison nor the Jewish Corporation has ever said that was the reason why she was terminated. Mr. Ellison did not. And what about the fact that he didn't see the key e-mail in and of itself? You're saying the fact that he didn't see the key e-mail in itself, what's your response to that? My response is it was reported to him what happened. It was reported to him that this money went out to individuals that she had gone out to and that she was notified of. So what happened was that this money went out. And the department said, wait a minute. That doesn't make any sense. People are being treated – people are being treated differently that we think are the same. So when they contact us tomorrow, he says, wait a minute. I sent – I sent this regular e-mail about this. That shouldn't have happened. So that's the fact. But the fact that he didn't see the e-mail is of no harm. The fact is he was advised of what – of what had happened and what was her – what her role was. And he knew that she was distinctly involved in the – in the assessment because she interviewed him along with Mr. Maher. And the contention that she wasn't involved, honestly, is just so overwhelmed by the evidence that it is – it is not, frankly, a good faith response to what happened here. I would like to point one other thing out about the district court's decision. Although we agree with its ultimate conclusion that no – that neither claim should survive summary trusting, the fact is, is that Ms. Grady was replaced by a female. Now, Judge – Judge Romine noted that the fact that she was eventually replaced by a female was very strong evidence of the defendant's position, but not – not the final word. So he continued on in his analysis. We submitted to the court that he could have ended his analysis right there, that the individual that held the position temporarily was never considered to be qualified to be the ultimate director of human resources at the Riverdake Corporation. Never given – never given that title, never given that salary, and then ultimately Mr. Ellison hired a female to fill that position. But that wouldn't address the disability claim. I'm sorry? That wouldn't address the disability claim. That's correct. It wouldn't. It wouldn't. But as far as the disability claim, Your Honor, first of all, as the court noted, it's a higher standard. It's a buffer standard. Okay. There's no evidence whatsoever that Ms. Grady's disabilities played any role whatsoever in her employment. Okay. As you correctly noted, so the board – a gentleman by the name of Cleve Taylor was hired as board president. He threw out Marion Scott and Real Estate, and Ms. Grady testified as she quoted. It was like a breath of fresh air. They threw out Marion Scott and Real Estate. They put Ms. Grady back as human resources director. They increased her salary. Okay. And then he had the other two gentlemen be acting general managers. There's no record evidence at all that her disability was in any way, shape, or form on anybody's mind with regard to any action that was taken with regard to her. It's just no evidence of the claim at all. So for those reasons, we request that the court affirm the district court's decision granting summary judgment on both claims. Thank you. Thank you. Mr. Sussman, you have two minutes in rebuttal. Thank you. My client was replaced by a trade – trade promise for 14 months. After she filed this lawsuit alleging gender discrimination, the promise was replaced by female. Those are the facts. So until that filing of the lawsuit, Mr. Thomas was the same individual who got the same number. What she did was the assistant director replaced her. With regard to counsel's argument with respect to the circumstances, the circumstances would not be clear with regard to the motion for summary judgment. Ms. Radian was not the individual who was responsible for making adjustments to pay. She was not the individual responsible for making exemption decisions. Those decisions were made in early August, as is shown in the record. You look at the statement of material facts that I submitted by Mr. Morolla. Mr. Morolla was the person who was the chief of finance and had previously given testimony to making those decisions. Ms. Radian's understanding was that the communications that were relevant were those going between Mr. Morolla, Mr. Morolla, and Mr. Ellison. There was never a direction given to her to make any – make any change with regard to those – So you think it's reasonable that she got the email from the lawyer and concluded that it wasn't relevant because she had to get emails from other figures? It is reasonable for her in the context of her involvement. Counsel is correct in the court's earlier questions. Correct. She had a limited role in a range of meetings with the department heads, one of which is that Ellison went to, with regard to this whole process. She wasn't entirely excluded, and we've never said she was entirely excluded. The question is whether she could be blamed for failing to make adjustments and how to get the best evidence of this. But isn't the question in fact whether the company did in fact blame her? It's not whether the company was right or wrong. It's whether that was the explanation for her dismissal. Right. And what I'm arguing is that those who were involved in the decision did not blame her. That is, Mums, Morolla. They were involved integrally in this, and they did not blame her because they knew that the communication that she was expecting with regard to any of this would be communication that was going to be changed from then, and that never happened. On August 3rd, Mr. Morolla made the determination and announced the determination company-wide with regard to the status of these individuals. Mr. — with regard to the testimony that counsel asserted about his client, Mr. Ellison, Mr. Ellison expressed hostility toward the disability in the period he was general manager. But my client went to him and said to him, he's scheduling meetings, executive meetings, the guys director of human resources are supposed to be at. On the Wednesday that you've given me a reasonable accommodation, that is, the company has to be off, he brushed her aside and said, you're not necessarily at the meetings. And he included Mr. Thomas in those meetings. So for counsel to say that there's no evidence of disability discrimination, I disagree. There is. She has raised the issue with him repeatedly. He brushed her aside and acted like her accommodation was of no moment in scheduling those meetings. He's the decision-maker. And he knew nothing about who was responsible and testified to this with regard to the issue that we're talking about. He didn't say Mr. Ray, you were supposed to do X, Y, and Z. He never said that in his deposition. He said he didn't know the process. All right. Thank you, Mr. Sussman. Thank you to both of you. We'll reserve decision. Have a good day. Thank you, Mr. Chairman.